IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MADISON METROPOLITAN
SCHOOL DISTRICT,

                                Plaintiff,

          v.

P.R., by and through his Parents,
TERESA and RUSTY R.,

                            Defendants.

OPINION AND ORDER

08-cv-385-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

TERESA and RUSTY R., individually and
as parents of their minor child, PATRICK R.,

                            Plaintiffs,

          v.

MADISON METROPOLITAN
SCHOOL DISTRICT,

                            Defendant.

08-cv-427-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

     On July 7, 2008, Madison Metropolitan School District filed its complaint in case

1

number 08-cv-385-bbc.  The complaint was filed under 20 U.S.C. § 1415(i)(2) and Wis. Stat. § 115.80 as an appeal of a state administrative law judge's decision that under the Individuals with Disabilities Education Act, the District was required to partially reimburse P.R.'s parents for the tuition they pay for P.R. to attend the Little Red Preschool.

On July 3, 2008, Teresa and Rusty R. filed a complaint against the District in the Circuit Court for Dane County, Wisconsin, under Wis. Stat. § 115.80.  In their complaint, Teresa and Rusty ask the court to order the District to pay their reasonable costs and attorneys fees associated with the due process hearing that resulted in the state administrative law judge's May 21, 2008 decision, because their son P.R. was the prevailing party in that hearing.  Teresa and Rusty R. also appealed the state administrative decision, arguing that the District should completely reimburse P.R.'s tuition paid at the Little Red Preschool.

On July 25, 2008, the District properly removed Teresa's and Rusty's state court complaint to this court, where the case was numbered 08-cv-427-bbc.  On August 7, 2008, cases 08-cv-385-bbc and 08-cv-427-bbc were consolidated.  Dkt. #8 in case 08-cv-385-bbc; Dkt. #13 in case 08-cv-427-bbc.[1]  On November 10, 2008, the District filed a motion for summary judgment.  Dkt. #18.  Instead of filing a response to the District's summary

---

[1]To simplify citations to the docket, any further references to docket numbers will be only to the docket in case number 08-cv-385-bbc.

2

judgment motion, P.R. filed his own summary judgment motion as a response to the District's motion.  Dkt. #22.  Therefore, the parties have both moved for summary judgment.

The District notes that P.R.'s summary judgment motion was filed after the dispositive motion deadline, which was November 10, 2008.  Despite P.R.'s failure to follow correct procedure, I will consider the parties' cross motions for summary judgment.  Neither party has introduced additional evidence outside the evidence that was before the state administrative law judge during the administrative proceedings.  When no new evidence is presented to a district court in the appeal of an administrative law judge's decision under the Individuals with Disabilities Education Act, a motion for summary judgment "'is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record.'"  Heather S. v. Wisconsin, 125 F.3d 1045, 1052 (7th Cir. 1997) (quoting Hunger v. Leininger, 15 F.3d 664, 669 (7th Cir. 1994)).  Therefore, I will treat the cross motions for summary judgment as a joint request to decide the case on the basis of the administrative record.

Relying on the preponderance of the evidence and giving due weight to the administrative law judge's decision, I find that P.R.'s part-time enrollment at the Little Red Preschool was a necessary component for providing him a free appropriate public education in the least restrictive environment.  Thus, the District was responsible for paying the cost

3

of his part-time enrollment.  Therefore, the administrative law judge's decision will be affirmed and the parties' summary judgment motions to alter the decision will be denied. Further, Teresa and Rusty R. will have until March 16, 2009, in which to file a summary judgment motion with respect to their attorney fees claim.

The following facts are undisputed and found in the administrative record.


UNDISPUTED FACTS

A.  <u>Parties</u>

Madison Metropolitan School District is a body politic that is incorporated, organized and operated under the Wisconsin Statutes with its office located in Madison, Wisconsin.  The District receives federal funding, including funding under the Individuals with Disabilities Education Act.  Teresa and Rusty R. are the parents of P.R., who was born on November 12, 2003.  Teresa, Rusty and P.R. reside within the District's boundaries.


B.  <u>P.R.'s Individualized Education Program</u>

1.  <u>Preparation for P.R.'s initial evaluation</u>

On April 9, 2007, P.R. was referred to the District for an evaluation to determine whether he was eligible for special education and related services.  Connie Pernitz, a special education support teacher, served as the chairperson and the District's representative on

4

P.R.'s individualized education program team.  As a program support teacher, Pernitz conducts special education evaluations of preschoolers.  As the chairperson on P.R.'s individual education program team, Pernitz was responsible for organizing and running team meetings, organizing materials used at the meetings and meeting with P.R.'s family.

On April 17, 2007, Pernitz met with Teresa to review existing information about P.R. At the meeting, Teresa provided Pernitz with information regarding her and Rusty's concerns about P.R.'s development as well as where P.R. spent his days.  Specifically, Teresa explained that P.R. was attending Kindercare for approximately nine and a half hours a day, five days a week.  Teresa also informed Pernitz that she and Rusty were looking at changing P.R.'s "care to a private nanny over the summer, and then hopefully helping him reintegrate to a preschool in the fall."  P.R. attended Kindercare until the end of May 2007.

## 2.  Creation of P.R.'s individualized education program

On June 5, 2007, P.R.'s individualized education program team held a meeting. Although both parents were members of P.R.'s program team, only Teresa attended the June 5 meeting.  At the meeting, the program team determined that P.R. qualified for special education services because he satisfied the criteria for the disability known as "significant developmental delay."

In developing P.R.'s individualized education program, the program team discussed

5

parental concerns and determined P.R.'s level of educational performance, including how his disability affected his involvement and progress in his daily activities. Teresa informed the program team that she and Rusty were concerned about P.R.'s difficulty in situations with peers and groups, including situations in the preschool setting. Teresa explained that if P.R. was going to be in a group setting, she and Rusty wanted him to have help interacting with peers.

The District did not operate any regular public education program for preschool age children. Teresa informed the program team that she and Rusty had enrolled P.R. in the Little Red Preschool for the fall but over the summer, P.R. would spend his days at home with a nanny. Teresa also explained that she was not certain whether P.R. would be allowed to attend the Little Red Preschool in the fall because he needed to be toilet trained to attend. Nonetheless, Teresa agreed that she wanted P.R.'s special education services delivered at the Little Red Preschool. The Little Red Preschool is a private childcare program for typically-developing preschool-aged children and is located in Middleton, Wisconsin. Little Red charges parents of enrolled children tuition for its services. Little Red's all-day, five day a week program costs $200 a week, and its two half days a week program, which covers approximately five hours a week, costs $185 a month.

From the information before it, the program team concluded that P.R. was delayed in both his daily living skills, such as dressing and toilet training, and his fine motor skills,

such as copying a cross and cutting paper.  The program team further concluded that P.R. had difficulty in free play in group settings with his peers and in following teacher direction. The team discussed and created four individual goals for P.R.:

[1] [P.R.] will demonstrate the following 8/10 opportunities: given foreshadowing, will make smooth transitions between activities; will comply with directions given by a teacher; will request help verbally from a caregiver when he has difficulty; will follow classroom rules with assistance and prompts.

[2] [P.R.] will demonstrate prosocial behavior by meeting the following objectives 8/10 opportunities: will engage in back and forth games with peers, will label his feelings and those of others; will play alongside another child without conflict; will accept compromise when suggested by peer or caregiver.

[3] [P.R.] will demonstrate age appropriate self help skills 3 of 5 opportunities by using a potty for urination, and by assisting with dressing by independently putting on his jacket, pants, shirt, and socks.

[4] [P.R.] will demonstrate increased fine motor control needed to manipulate materials in his educational environment 8 out of 10 opportunities, including cutting on a line, coloring within 1" accuracy, and making a representational drawing of a face.

Admin. Rec., dkt. #11, part 4, P.R.'s Individualized Education Program.  P.R.'s program stated that P.R. would participate full-time with non-disabled peers in age-appropriate settings, non-academic activities and extracurricular activities.

P.R.'s program stated that he was to be provided specially designed instruction, related services and supplementary aids and services.  P.R.'s specially designed instruction consisted of three hours of direct instruction each week, which was to be provided in his

"preschool natural environment."  P.R.'s related services consisted of one hour a week of occupational therapy, which was to be provided in his "preschool natural environment."  The supplementary aids and services P.R. was to receive consisted of (1) stories and picture cues, which were to be provided throughout the school day; (2) sensory strategies to be investigated for efficacy, which were to be provided throughout the school day; and (3) modeling and reinforcement for regular education staff, which was to be provided 30 minutes a week.  All supplementary aids and services were to be provided in P.R.'s "preschool natural environment."  P.R.'s program also provided program modification or supports for school personnel, which consisted of consultation among school staff for 30 minutes a month in the "preschool natural environment."

On the page of P.R.'s program entitled "Individualized Education Program (IEP) Community-Based Services for Preschool Students" it states, "These services are not needed to provided [sic] [free appropriate public education]."  That page lists the Little Red Preschool as the provider and "parents" as the funding source.  There is also a note that "[P.R.] will be at home with a nanny over the summer, and parents are expecting him to attend Little Red Preschool in the Fall of 2007."

Finally, the program's "Determination and Notice of Placement" page states in part:

The [individualized education program] developed on **6/05/07** will be implemented at **Community and home based site**
. . .

8

> The IEP team discussed the array of services offered by MMSD for preschoolers with identified disabilities, including the more restrictive environment of the special education classroom setting. The IEP team, including the parents, strongly feel that [P.R.] should be supported in the regular education environment, in an attempt to provide him with successful experiences and learning along with typically developing peers.

Admin. Rec., dkt. #11, part 4, P.R.'s Individualized Education Program (emphasis in original). Because P.R.'s parents had him enrolled at Little Red and expected him to attend there in the fall, the program team considered Little Red to be P.R.'s natural environment, which means that they expected P.R. to receive his program's special services at Little Red. Because P.R. would be with typically developing peers at Little Red, the team agreed that it would be appropriate for P.R. to receive his special services there. Further, because the team agreed that Little Red was an appropriate environment and P.R.'s natural environment, it did not discuss any other preschool settings with non-disabled children in developing P.R.'s program.

Even though the team expected that special services would be provided to P.R. at Little Red, they did not list in P.R.'s individualized education program a specific location or building where the special services would be provided. Further, the team never discussed who would be responsible for paying P.R.'s tuition at Little Red, and Teresa never asked whether the District would pay for the tuition. Teresa signed P.R.'s program, providing consent for him to receive the services listed in the program.

9

3.  <u>Implementation of P.R.'s individual education program</u>

P.R. was admitted and began attending the Little Red Preschool in the fall of 2007.

P.R. attended Little Red for approximately nine hours a day, five days a week.  In accordance

with P.R.'s individualized education program, a district-employed special education teacher,

Linda Hugdahl, and occupational therapist, Tracy Qualey, began providing special education

services to P.R. at Little Red in the Fall of 2007.  Among the services provided by the special

education teacher and therapist were modeling and reinforcement 30 minutes a week, which

required them to help the regular preschool staff learn how to use the supports, social stories,

picture cues, sensory strategies and any other techniques or materials that were developed

by the special education teacher and therapist to help P.R. meet his annual goals.  This

communication with the preschool staff was intended to help P.R. generalize what he was

learning from his special education teacher.  Although the Little Red staff was not expected

to implement P.R.'s individualized education program, they were expected to cooperate with

P.R.'s special education teacher because such cooperation would improve the likelihood that

P.R. would achieve his goals faster.

During the 2007-2008 school year, P.R. benefited from the individualized education

program created for him and made progress toward his program goals.  The District's special

education and related services, including the cost of District staff, their transportation to

Little Red, equipment and supplies, were provided to P.R. at Little Red at no cost to P.R.'s

parents.  The District did not pay any of P.R.'s tuition at Little Red.

## C.  Administrative Proceedings

On February 20, 2008, on behalf of P.R., Teresa's and Rusty's attorney filed a complaint with the district requesting a due process hearing.  The complaint states in part:

> The basis for this request for due process is that Madison Metropolitan School District has improperly refused to pay the tuition for [P.R.]'s special education placement as determined by his IEP team, at the Little Red Preschool.  This denies his right to a **free** appropriate public education under both state and federal special education law.

Admin. Rec., dkt. #11, part 4, P.R.'s Feb. 20, 2008 Notice (emphasis in original).  The relief requested was District payment for P.R.'s tuition.  The Wisconsin Division of Hearings and Appeals assigned administrative law judge Sally Pederson to handle the complaint.   On February 29, 2008, the District filed its answer to the complaint and stated in part:

> Providing services on site at a preschool student's community-based day-time location, where his parents have elected to enroll him, does not obligate the District to pay the tuition costs related to [P.R.]'s enrollment, and the District declined to do so.   It is the District's position that the Parents are responsible for the costs associated with their enrollment of [P.R.] at the daycare/preschool.

Admin. Rec., dkt. #11, part 4, District's Feb. 29, 2008 Answer.  The parents and the District agreed that the issue before the administrative law judge was "whether the School District violated the Individuals with Disabilities Education Act when it failed to pay the tuition costs of [P.R.]'s attendance at the private Little Red Preschool while providing special

11

education services at the preschool[.]"

A due process hearing was held on April 14, 2008, and the parents and the District were permitted to submit post-hearing briefs.  The administrative law judge issued her decision on May 21, 2008.  In her decision, the administrative law judge reasoned in part as follows:

> A proper Notice of Placement must state a specific physical location where services will be provided to a student.  The Determination and Notice of Placement in [P.R.]'s IEP is not specific as to location and, as such, does not provide legally sufficient notice of placement.  Of course, the reality in this case is that the entire IEP team expected [P.R.] to receive the services in his IEP at the Little Red Preschool, as stated on page 22 of the IEP.

> The semantics game regarding placement that is contained in this IEP looks like an attempt to treat [P.R.]'s attendance at Little Red Preschool as a unilateral parental placement in a private school for which the District is not responsible.

> . . .

> [T]he District can not abdicate its responsibility of ensuring that an IEP team, not solely the parents, makes the placement determination, including determining the appropriate specific location where the services will be provided.  By allowing parents to decide if they want their children to attend private preschools, rather than having the IEP team determine the appropriate location of services, the District has essentially taken the position that these are unilateral parental placements that do not need to be provided by the District at no cost to the parents.

> . . .

> [T]he District allowed the Parents to determine the location with the expectation that the District would not be responsible for payment of any related tuition costs.

12

Although the Determination and Notice of Placement is improperly vague, it is clear that the IEP team believed the IEP would be implemented at the Little Red Preschool.

. . .

Based upon the IEP, it is apparent that the IEP team believed [P.R.] needed at least part-time interaction with nondisabled peers in a non-restrictive environment. . . . The District improperly laid the placement location determination at the Parent's feet with the expectation that the Parents would then be responsible for the cost of any private preschool tuition.

Cpt., dkt. #1, ex. A, at 5-7.  The administrative law judge concluded that

[T]he most equitable remedy in this matter is for the District to reimburse the Parents $185.00 per month for each month that the Parents paid tuition for [P.R.] to attend the Little Red Preschool during the effective dates of the IEP.  The Parents are responsible for any additional tuition costs related to [P.R.] attending Little Red for more than two half-days per week.

Cpt., dkt. #1, ex. A, at 7.

OPINION

A.  Standard of Review and Burden of Proof

In reviewing administrative agency decisions under the Individuals with Disabilities Education Act, the court shall 1) receive the records of the administrative proceedings; 2) at its discretion, admit additional evidence at the request of a party; and 3) base its decision on the preponderance of the evidence, granting relief that it determines to be appropriate. 20 U.S.C. § 1415(i)(2)(C); Board of Education v. Ross, 486 F.3d 267, 270 (7th Cir. 2007).

13

Although courts must independently determine whether the requirements of the Act have been satisfied, they must give "due weight" to the results of the administrative decisions and not substitute their "own notions of sound educational policy for those of the school authorities which they review." Board of Education of Hendrick Hudson Central School District v. Rowley, 458 U.S. 176, 206 (1982)); see also Ross, 486 F.3d at 270 (citing Rowley standard). The Court of Appeals for the Seventh Circuit has interpreted "due weight" to mean that courts must review the state hearing officer's findings of fact deferentially. Ross, 486 F.3d at 270; Heather S. v. State of Wisconsin, 125 F.3d 1045, 1053 (7th Cir. 1997); Board of Education of Murphysboro Community Unit School District No. 186 v. Illinois State Board of Education, 41 F.3d 1162, 1167 (7th Cir. 1994).

However, the meaning of "due weight" varies from case to case, depending on how much the court relies on evidence that was not before the hearing officer. Alex R. v. Forrestville Valley Community Unit School District No. 221, 375 F.3d 603, 12 (7th Cir. 2004). For example, when a reviewing court does not take new evidence and relies solely on the administrative record, it owes considerable deference to the hearing officer and may set aside the administrative order only if it is "strongly convinced that the order is erroneous." Id. (quoting School District of Wisconsin Dells v. Z.S., 295 F.3d 671, 675 (7th Cir. 2002), and noting that standard analogous to that of clear error or substantial evidence). The more a court relies on new evidence, the less it should defer to the administrative decision and

14

instead act as the fact finder.  Id.

As the District correctly points out, any questions of law are reviewed de novo.  Ross, 486 F.3d at 270.  At the administrative hearing, P.R. bore the burden of persuading the hearing officer that the District had violated the Individuals with Disabilities Education Act.  Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 57-58 (2005).  Here, both parties are challenging the outcome of the state administrative decision and thus, both parties bear the burden in this case.  Id.

## B.  Individuals With Disabilities Education Act

The Individuals with Disabilities Education Act requires that school districts receiving federal funds provide disabled students with a free appropriate public education in the least restrictive environment.  20 U.S.C. § 1412(a)(1) & (5).  A free appropriate public education comprises special education and related services that

> (A) have been provided at public expense, under public supervision and direction, and without charge;
> (B) meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9).  "Special education" is defined as

> specially designed instruction, at no cost to parents, to meet the unique needs of a

15

child with a disability, including--

(A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and
(B) instruction in physical education.

20 U.S.C. § 1401(29).   "Related services" are defined as "transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education . . . .  20 U.S.C. § 1401(26). Providing such special education and related services in the least restrictive environment requires that

[t]o the maximum extend appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A).

In an effort to insure that disabled students receive a free appropriate public education in the least restrictive environment, school districts are required to develop an individualized education program for each disabled student.  A student's individualized education program must be written and developed, reviewed and revised in accordance with 20 U.S.C. § 1414(d).  Among the list of requirements under § 1414(d), an individualized education program must include:  "a statement of measurable annual goals, including

16

academic and functional goals, designed to . . . meet each of the child's other educational needs that result from the child's disability," 20 U.S.C. § 1414(d)(1)(A)(i)(II)(bb), and "a statement of the special education and related services and supplementary aids and services . . to be provided to the child . . . ," 20 U.S.C. § 1414(d)(1)(A)(i)(IV), as well as "the projected date for the beginning of the services and . . . the anticipated frequency, location, and duration of those services . . . ," 20 U.S.C. § 1414(d)(1)(A)(i)(VII).

If the parents of a disabled student want to challenge whether the student is receiving free appropriate public education, they may request a due process hearing.  20 U.S.C. § 1415.  Any party aggrieved by the findings and decision made according to the hearing can appeal the decision to a district court of the United States.  20 U.S.C. § 1415(i)(2)(A).  On such an appeal, a district court has a twofold inquiry:  (1) "has the State complied with the procedures set forth in the Act[;]" and (2) "is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits[.]"  Rowley, 458 U.S. at 206-07.  "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more."  Id.

## C.  The Parties' Disputes

Neither P.R. or the District agrees with the administrative law judge's decision.  The

17

administrative law judge determined that the District violated the Individuals with Disabilities Education Act when it failed to pay a portion of P.R.'s Little Red Preschool tuition.  Although the administrative law judge does not explicitly list the District's exact violation, I understand her to have reached the following determinations:  (1) the District's failure to list the specific physical location where P.R. would receive special education services made P.R.'s placement improperly vague; (2) despite this violation, the facts established that P.R.'s parents informed the others on his program team of their intention to enroll P.R. at the Little Red Preschool and thus, P.R.'s program team expected and intended that P.R. receive his special education services at Little Red; (3) P.R.'s program team believed that Little Red was an appropriate location for him to receive his special education services because it was his natural environment, that is, where he was expected to spend his days, and it permitted interaction with non-disabled peers, in satisfaction of both the Act's least restrictive environment requirement and one of P.R.'s individualized education program goals; (4) no other appropriate location was offered; and (5) because Little Red was the assumed specific physical location where P.R. needed to receive special education services, the most equitable remedy was for the District to pay the portion of P.R.'s tuition at Little Red that would cover the approximately four and one half hours each week when he was to receive special education in a preschool setting.

The District contends that it should not have to reimburse P.R. for any of the cost

18

of tuition for attendance at Little Red because it need not pay the cost of P.R.'s childcare to provide him with free appropriate public education in the least restrictive environment. P.R. contends that he should be reimbursed for the entire cost of tuition to attend Little Red, because P.R.'s individualized education program team had agreed to his placement at Little Red for nine hours a day, five days a week.

1. The administrative law judge's subject matter jurisdiction

Among its list of contentions, the District challenges whether the administrative law judge had subject matter jurisdiction to reach her decision because it believes that she decided a procedural issue that was not raised in P.R.'s due process hearing complaint. Specifically, the District contends that the administrative law judge determined that the District committed a procedural violation in providing P.R. with a free appropriate public education but that P.R.'s complaint did not allege any procedural violations against the District. However, the District's contention is based on an erroneous interpretation of the administrative law judge's decision.

The District correctly points out that under 20 U.S.C. § 1415(f)(3)(B), the subject matter of a due process hearing is limited as follows:

> The party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the notice filed under subsection (b)(7) of this section, unless the other party agrees otherwise.

19

Nonetheless, the administrative law judge's decision does not violate § 1415(f)(3)(B), for two reasons.  First, P.R.'s "notice" or due process hearing complaint raised procedural issues. P.R. alleged in the notice that the District had denied P.R. "his right to a **free** appropriate public education."  Admin. Rec., dkt. #11, part 4, P.R.'s Notice (emphasis in original.) There can be both procedural and substantive violations in failing to provide a disabled student with a free appropriate public education.  Because the notice did not specify the type of violation, it encompasses both.  If the District thought P.R.'s notice deficient, it could have challenged its sufficiency.  20 U.S.C. § 1415(c)(2)(A).  Because the District did not do so, the notice is deemed sufficient as a matter of law.  Id.

Second, even assuming that P.R.'s notice did not raise the issue whether the District had committed a procedural violation, it is erroneous to characterize the administrative law judge's decision as finding that the District committed only a procedural violation in determining the physical location where P.R. would receive his special education services. Although lacking specificity, the administrative law judge's decision made clear that the District's failure to pay for a portion of P.R.'s tuition at Little Red was a substantive violation of the Individuals with Disabilities Education Act's requirement that the District provide P.R. an appropriate preschool education free of charge.  Therefore, the administrative law judge had subject matter jurisdiction.

20

2.  <u>Educational placement versus location</u>

The District contends that as a matter of law the administrative law judge erred in her decision because she conflated two separate legal concepts: educational placement and location for delivering educational services.  The District contends that it satisfied its duty to determine and list P.R.'s educational placement in its creation of P.R.'s individualized education program and that any failure to determine and list a specific location for delivering services was merely a technical mistake that did not affect the adequacy of P.R.'s individualized education program.  Contrary to the District's contention, the administrative law judge did not conflate those concepts.

The District correctly points out that the Court of Appeals for the Seventh Circuit has determined that "'educational placement' . . . means something more than the actual school attended by the child and something less than the child's ultimate educational goals." <u>Board of Education of Community High School District No. 128 v. Illinois State Board of Education</u>, 103 F.3d 545, 549 (7th Cir. 1996).  Nonetheless, the Seventh Circuit's determination makes clear that the actual or particular school or location where a child will receive his educational services is an element of a proper education placement.  In fact, in some circumstances, the location determination is a critical element of the education placement determination.  <u>A.K. ex rel. J.K. v. Alexandria City School Board</u>, 484 F.3d 672, 680 (4th Cir. 2007) ("[A] change in the location at which special education services are

21

provided causes a change in 'educational placement' if the location change results in a dilution of the quality of a student's education or a departure from the student's least restrictive environment-compliant setting.") (internal alterations and quotations omitted).

Moreover, the Individuals with Disabilities Education Act requires that a student's individualized education program state "the projected date for the beginning of the services and . . . the anticipated frequency, *location*, and duration of those services . . . ." 20 U.S.C. § 1414(d)(1)(A)(i)(VII) (emphasis added). Thus, whether a school district has properly determined and stated the specific location for a student's services is not distinct from whether the district properly determined and wrote an adequate individualized education program. See, e.g., A.K., 484 F.3d at 680 ("In light of the fact that the school at which special education services are expected to be provided can determine the appropriateness of an education plan, it stands to reason that it can be a critical element for the IEP to address."). The physical placement or location determination is an element of the overall educational placement determination.

Because the location determination can be a critical element in determining whether an individualized education program is an adequate offer of a free appropriate public education, A.K., 484 F.3d at 680, I disagree with the District's contention that stating the particular location where services will be provided is a mere technical requirement separate from a student's educational placement determination. Therefore, the administrative law

22

judge correctly addressed P.R.'s physical placement or location as a critical element of his overall educational placement determination.

3.  The District's violation of the Individuals with Disabilities Education Act

As previously discussed, the administrative law judge's decision can be summarized as follows:  the District's failure to pay for a portion of P.R.'s tuition at Little Red was a substantive violation of the Individuals with Disabilities Education Act's requirement that the District provide P.R. an appropriate preschool education free of charge.  Although the parties are challenging the administrative law judge's decision, they do not dispute that the special education and related services listed in P.R.'s individualized education program and delivered to him at Little Red through itinerant teachers provided him an appropriate preschool education.  What the parties dispute is whether the District should have paid any of P.R.'s tuition to be enrolled at Little Red.  In other words, the issue here is whether providing P.R. with an appropriate preschool education free of charge required the District to pay for *both* the itinerant special education services provided to P.R. and the tuition required for P.R.'s part time enrollment at Little Red.

The District contends that it should be required to pay only for the itinerant special education services because P.R.'s parent's decision to enroll him at Little Red was based solely on their work schedules and the resulting need to have P.R. in daycare approximately

23

nine hours a days, five days a week.  The District contends further that P.R.'s individualized education program team agreed that it would be appropriate to provide itinerant special education services to P.R. at Little Red because that was his natural environment, that is, the setting where P.R. would be each day, and the least restrictive environment.  Also, according to the District, had P.R.'s natural environment been at home with a nanny, the services could have been provided appropriately there as well without violating the Individuals with Disabilities Education Act's least restrictive environment requirements.  The administrative law judge found the District's contentions unpersuasive and contrary to the credible evidence in the record.  I agree.

According to the Department of Education's interpretation of the federal rules and regulations related to the Individuals with Disabilities Education Act's least restrictive environment requirement:

> Public agencies that do not have an inclusive public preschool that can provide all the appropriate services and supports must explore alternative methods to ensure that the [least restrictive environment] requirements are met.  Examples of such alternative methods might include placement options in private preschool programs or other community-based settings.  Paying for the placement of qualified preschool children with disabilities in a private preschool with children without disabilities is one, but not the only, option available to public agencies to meet the [least restrictive environment] requirements.  We believe the regulations should allow public agencies to choose an appropriate option to meet the [least restrictive environment] requirements.  However, if a public agency determines that placement in a private preschool program is necessary as a means of providing special education and related services to a child with a disability, the program must be at no cost to the parent of the child.

24

71 Fed. Reg. 46,540-01, 46,589 (Aug. 14, 2006).  Furthermore, although generally neither an administrative law judge or a court should go beyond the four corners of an individualized education program to determine what the program requires or offers, an examination of extrinsic evidence to determine what the team intended is permissible when the program is vague.  John M. v. Board of Education of Evanston Township High School District 202, 502 F.3d 708, 715-16 (7th Cir. 2007).  As the administrative law judge found, P.R.'s individualized education program is vague with respect to what location would provide an appropriate environment for providing P.R. his special education services.  Thus, the circumstances surrounding the creation of P.R.'s individualized education program are relevant to what location his program team intended to be the appropriate location for receiving special education services.

Although P.R.'s parents needed daycare while they worked, that fact is irrelevant to the Individuals with Disabilities Education Act's requirement that disabled students like P.R. receive special education services in the least restrictive environment.  As the administrative law judge found, P.R.'s program team "did not consider it appropriate for all the services in the [individualized education program] to be provided to [P.R.] at home."  Cpt., dkt. #1, ex. A at 6.  Moreover, P.R.'s program team decided that it was appropriate for him to participate full-time with non-disabled peers in age-appropriate settings.  Thus, to satisfy the Individuals with Disabilities Education Act's least restrictive environment requirement that

25

P.R. be educated and have interaction with children who are not disabled, P.R. had to receive his special education services in a setting with non-disabled peers.  P.R.'s program team agreed that the appropriate setting for such education was at Little Red.

Although the District contends that P.R. could have received his special education services in other community-based settings, such as library play groups, P.R.'s individualized education program team never considered any other community-based options or specific locations besides Little Red.  P.R.'s program team determined that P.R. needed peer interaction and his individualized education program included a goal related to obtaining pro-social behavior through such peer interaction.  The team did not determine that P.R. merely needed itinerant special education services, provided in any environment, to receive an appropriate preschool education.  Further, there is no evidence in the administrative record that P.R.'s program team considered a location other than Little Red.  Therefore, the administrative law judge did not err in concluding that receiving special education services in the environment at Little Red was a necessary component of providing P.R. an appropriate preschool education in the least restrictive environment.  As a result, the administrative law judge did not err in concluding that the Individuals with Disabilities Education Act required that P.R.'s part-time enrollment at Little Red be provided at no cost to his parents.

Finally, I find it appropriate to address what I believe is the underlying concern the

District has with paying for a portion of P.R.'s tuition at Little Red.  The District's concern can be summarized as follows: (1) P.R.'s parents were planning to enroll him at Little Red before his individualized education program was created; (2) if P.R. did not need an individualized education program, his parents would have paid for his entire tuition because their work schedules required placing P.R. in some form of daycare for approximately nine hours a day, five days a week; and (3) the District was trying to accommodate P.R. and his parents by sending itinerant special education teachers to Little Red for P.R., as opposed to transporting P.R. to another location for several hours a week to provide the appropriate special education services.  However, the District fails to cite any persuasive support why it should not have to pay for the necessary non-disabled peer interaction component of P.R.'s program just because P.R.'s parents had enrolled him in what the program team agreed was an appropriate least restrictive environment.

The Individuals with Disabilities Education Act is clear that the District is required to provide disabled preschool-age students an appropriate preschool education at no charge and that appropriate education must be provided, to the maximum extent appropriate, with other children who are not disabled.  20 U.S.C. §§ 1401(9) & 1412(5)(A).  The District is responsible for the costs of satisfying the statute because it is the District, not parents of disabled preschool-age students, that receives funds from the federal government to assist with the education of all children with disabilities.  Furthermore, the Individuals with

27

Disabilities Education Act notes that "the education of children with disabilities can be made more effective by . . . providing incentives for whole-school approaches . . . and early intervening services to reduce the need to label children as disabled." 20 U.S.C. § 1400(c)(5)(F). Yet, permitting a school district to obtain a financial windfall by not paying for portions of private preschool programs or daycare settings that provide disabled students necessary non-disabled peer interaction would be a disincentive for school districts to create inclusive public preschools that could provide all the appropriate services and supports necessary to insure that disabled preschool aged students receive a free appropriate public education in the least restrictive environment.

In this case, the District could have offered P.R.'s parents other appropriate community-based options that may have satisfied the Individuals with Disabilities Education Act's least restrictive environment requirement. If P.R. had spent his days at home with a nanny providing his daycare services, the District does not deny that it would have had to find some method for providing P.R. with non-disabled peer interaction and that it would have had to pay for transporting P.R. to play groups and, possibly, for creating the play groups. However, the District did not offer P.R. any such alternative options. Instead, it played what the administrative law judge called a "semantics game." Although the District agreed that Little Red was an appropriate location for P.R. to receive his special education services, because it would provide interaction with non-disabled peers, it treated P.R.'s

enrollment at Little Red as a parental choice for purely daycare purposes, which meant that enrollment did not need to be provided by the District at no cost to the parents. The Individuals with Disabilities Education Act was not intended to reward such games. Requiring the District to reimburse P.R.'s parents for a portion of his tuition for attending Little Red is the most equitable remedy under the circumstances.

4. <u>P.R.'s request that the District pay for full-time enrollment at Little Red</u>

P.R. contends that his parents should be reimbursed for the entire tuition for full-time enrollment at the Little Red Preschool because P.R.'s individualized education program placed him there full-time. P.R. is wrong. Nothing in P.R.'s individualized education program even suggests that for him to receive an appropriate preschool education he needed to attend preschool full-time. P.R.'s individualized education program provides for approximately four and one-half hours of special education services in a preschool environment. Thus, I agree with the administrative law judge's determination that the District was responsible to pay for only part-time enrollment, that is, five hours a week, at Little Red. P.R.'s parents' decision and need to enroll P.R. at Little Red full-time was a personal one, above and beyond the requirements of his individualized education program. Therefore, Teresa and Randy R. are entitled to only partial tuition reimbursement.

5. Alleged violation of the spending clause

In Arlington Central School District Board of Education v. Murphy, 548 U.S. 291 (2006), the Supreme Court found that "when Congress attaches conditions to the State's acceptance of federal funds" pursuant to the Spending Clause of the United States Constitution, "the conditions must be set out unambiguously." The District contends that being required to pay for part of a student's attendance at a private preschool or daycare center to fulfill its least restrictive environment requirements for eligible preschool age children is a violation of its constitutional rights under the spending clause because it was not put on clear notice of such a requirement. The District's contention fails because there is no requirement that it make such payments for every disabled preschool-age child.

A decision that the District has to pay for a portion of P.R.'s attendance at Little Red does not create a requirement that the District has to make such a payment for every disabled preschool-age child. P.R.'s circumstances and his individualized education program are what require the District to pay for a part of his attendance at Little Red. P.R.'s program requires that he receive part-time interaction with non-disabled peers and the evidence supports the conclusion that the individualized education program team intended that such part-time peer interaction be at Little Red. The Individuals with Disabilities Education Act's least restrictive environment requirement is clear that "[t]o the maximum extend appropriate, children with disabilities . . . are educated with children who are not disabled

30

. . ." 20 U.S.C. § 1412(a)(5)(A).  Satisfaction of this requirement may require that a disabled preschool-age student be enrolled in a private preschool if placement in a private preschool program is necessary as a means of providing special education and related services to the student.  71 Fed. Reg. 46,540-01, 46,589.  Thus, the District cannot assert that it was unaware that as a condition of receiving funds under the Individuals with Disabilities Education Act it may be required to pay for the enrollment of a disabled preschool-age student in a private preschool.

The regulations also make clear that "public agencies [should be allowed] to choose an appropriate option to meet the [least restrictive environment] requirements."  Id. Allowing school districts to choose an appropriate option means that, in certain circumstances, the District could send itinerant special education services to preschool students at a daycare or private preschool without having to pay for the student's enrollment at the daycare or preschool.  If non-disabled peer interaction is a necessary component of a student's individualized education program, the District must offer some option to satisfy that necessity; whether it be through enrollment in a private preschool or library play groups. Otherwise, the District is free to choose other appropriate options.  Therefore, no new least restrictive environment requirement or condition is being thrust on the District.  Its constitutional rights under the spending clause have not been violated.

31

### D.  Attorney Fees and Costs

In its discretion, a court may award reasonable attorney fees and related costs to the prevailing party in an action brought under the Individuals with Disabilities Education Act. 20 U.S.C. §§ 1415(h)(i)(3)(B)-(G); see also Wis. Stat. § 115.80(9).  The complaint filed in the case brought by P.R.'s parents, 08-cv-427-bbc, requests such attorney fees and costs because they were the prevailing party in the due process hearing.  Dkt. #3, ex. A.  However, the parents' summary judgment motion does not request summary judgment on their attorney fees claim.  That claim remains unresolved.

Although a court trial is set for March 16, 2009, that trial will not be necessary to decide the attorney fees claim.  Instead, I believe that claim can be disposed of in motion form.  The parties will have until March 9, 2009, in which to inform the court of any objections they may have to cancelling trial.  Otherwise, the March 16 court trial will be removed from the court's calendar on March 10.  Teresa and Rusty R. have until March 16, 2009 to file a summary judgment motion on their attorney fees claim.

### E.  Conclusion

In sum, I conclude that the administrative law judge did not err in reaching her decision and equitable remedy.  For P.R. to receive an appropriate preschool education free of charge, it was necessary that he be enrolled part-time at Little Red at no cost to his

parents.  Therefore, the District violated the Individuals with Disabilities Education Act when it failed to pay the tuition costs for P.R.'s part-time attendance at the private Little Red Preschool while providing special education services at the preschool.


## ORDER

IT IS ORDERED that in Case No. 08-cv-385-bbc:

1.  Plaintiff Madison Metropolitan School District's motion for summary judgment, dkt. #18, is DENIED;

2.  The decision of the administrative law judge is AFFIRMED and plaintiff's appeal is DISMISSED;

3.  The clerk of court is directed to enter judgment in favor of defendant P.R., by and through his parents, Teresa and Rusty R.

FURTHER, IT IS ORDERED that in Case No. 08-cv-427-bbc:

1.  The motion for summary judgment filed by plaintiffs Teresa and Rusty R., individually and as parents of their minor child, Partick R., dkt. # 24, is DENIED;

2.  The decision of the administrative law judge is AFFIRMED;

3.  Plaintiffs have until March 16, 2009 in which to file a motion for summary judgment on their attorney fees claim.  Defendant District may have until March 30, 2009, in which to oppose the motion; plaintiffs may have until April 13, 2009, in which to file a reply.

Entered this 25th day of February, 2009.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge